# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

| | | |
|---|---|---|
| In Re: Appointment of a Receiver for the Chester Upland School District | : | |
| | : | |
| Appeal of: Pennsylvania Cyber Charter School | : | No. 2095 C.D. 2015 |
| | : | |
| In Re: Appointment of a Receiver for the Chester Upland School District | : | |
| | : | |
| Appeal of: Pennsylvania Virtual Charter School | : | No. 2096 C.D. 2015 |
| | : | |
| In Re: Appointment of a Receiver for the Chester Upland School District | : | |
| | : | |
| Appeal of: Agora Cyber Charter School | : | No. 2097 C.D. 2015 |
| | : | |
| In Re: Appointment of a Receiver for the Chester Upland School District | : | |
| | : | |
| Appeal of: Commonwealth Connections Academy Charter School | : | No. 2098 C.D. 2015 |
| | : | |
| In Re: Appointment of a Receiver for the Chester Upland School District | : | |
| | : | |
| Appeal of: Pennsylvania Department of Education and the Secretary of Education Pedro A. Rivera | : | No. 2181 C.D. 2015 |
| | : | |
| In Re: Appointment of a Receiver for the Chester Upland School District | : | |
| | : | |
| Appeal of: Pennsylvania Department of Education and Secretary of Education Pedro A. Rivera | : | No. 2182 C.D. 2015 |
| | : | |
| In Re: Appointment of a Receiver for the Chester Upland School District | : | |
| | : | |
| Appeal of: Commonwealth Connections Academy Charter School | : | No. 2183 C.D. 2015 |

In Re: Appointment of a Receiver for : 
the Chester Upland School District :
:
Appeal of: Agora Cyber Charter School : No. 2184 C.D. 2015
:
In Re: Appointment of a Receiver for :
the Chester Upland School District :
:
Appeal of: Pennsylvania Cyber Charter :
School : No. 2185 C.D. 2015
:
In Re: Appointment of a Receiver for :
the Chester Upland School District :
:
Appeal of: Pennsylvania Virtual Charter :
School : No. 2186 C.D. 2015
:
In Re: Appointment of a Receiver for :
the Chester Upland School District :
:
Appeal of: Achievement House Cyber :
Charter School : No. 2228 C.D. 2015
:
In Re: Appointment of a Receiver for :
the Chester Upland School District :
:
Appeal of: PA Distance Learning :
Charter School and PA Leadership : No. 2229 C.D. 2015
Charter School : Argued: October 17, 2016

BEFORE:    HONORABLE ROBERT SIMPSON, Judge
           HONORABLE ANNE E. COVEY, Judge
           HONORABLE MICHAEL H. WOJCIK, Judge

OPINION NOT REPORTED

MEMORANDUM OPINION BY
JUDGE COVEY                              FILED: September 13, 2018

Agora Cyber Charter School (Agora), Commonwealth Connections

Academy Charter School, Pennsylvania Cyber Charter School, Pennsylvania Virtual

Charter School, Achievement House Cyber Charter School, PA Distance Learning

Charter School, and PA Leadership Charter School (collectively, Cyber Charter Schools) appeal, and the Commonwealth of Pennsylvania (Commonwealth), Department of Education (Department) and Secretary of Education (Secretary) Pedro A. Rivera, cross-appeal from the Delaware County Common Pleas Court's (trial court) October 9, 2015 and October 29, 2015 orders approving the Chester Upland School District's (District) and the Department's October 2, 2015 Revised Joint Petition to Amend Financial Recovery Plan which modified the statutorily-mandated special education rate for all District Cyber Charter Schools and ordered the Commonwealth to provide the District with an additional $20 million in school funding.

On August 14, 2012, pursuant to provisions of the Public School Code of 1949 (School Code)[1] (as amended by Act 141 of 2012 (Act)[2]), the Department declared the District in financial recovery status.[3] In accordance with the School Code, the appointed chief recovery officer[4] created a financial recovery plan (Plan) which he presented to the District's Board of School Directors (Board) on November 13, 2012. On November 26, 2012, the Board rejected the Plan. Pursuant to Section 671-A of the School Code,[5] the Secretary petitioned the trial court to appoint a receiver. On December 13, 2012, the trial court issued an order appointing the

---

[1] Act of March 10, 1949, P.L. 30, *as amended*, 24 P.S. §§ 1-101 - 27-2702.

[2] Act of July 5, 2012, P.L. 1142, 24 P.S. §§ 6-601-A - 6-693-A, 9-921-A(a.1), 10-1073, 10-1076 - 10-1080, 16-1607, 16-1616, 21-2104. The Act added Sections 601-A through 693-A to the School Code pertaining to school districts in financial distress, and added or amended other statutory provisions pertaining to the approval and employment of district superintendents and assistant superintendents, reporting requirements for subsidies and funds received by intermediate units, and permitting students to wear military uniforms at high school graduation.

[3] Section 621-A of the School Code, 24 P.S. § 6-621-A, provides for the Secretary to, under certain conditions, issue a declaration that a school district is in financial recovery status.

[4] The Secretary appoints the chief recovery officer. *See* Section 631-A of the School Code, 24 P.S. § 6-631-A.

[5] 24 P.S. § 6-671-A.

2

receiver (Receiver) and directing the Receiver to implement the November 13, 2012 Plan.[6]

On August 18, 2015, the Receiver and the Department filed a joint petition to amend the Plan (Petition to Amend). The Petition to Amend sought to: modify the statutorily-mandated payments to District charter schools[7] for special education; modify the statutorily-mandated payments to District cyber charter schools for both regular and special education students; engage forensic auditors and a financial specialist; and pursue a loan restructuring. On August 25, 2015, the trial court disapproved the Petition to Amend to the extent it sought to modify charter school payments, explaining:

> [A]t the end of the year, there will still remain a 20.6 million dollars budgetary deficit. Thus the clear and convincing evidence established that the proposed [a]mendment would not eliminate the District's debt and would not provide any degree of certainty that either the [c]harter [s]chools or other entities who [sic] are owed money from the District, would be paid in a timely manner.

---

[6] On May 9, 2013 and October 8, 2014, the trial court granted petitions to amend the Plan and approved interest-free transitional loans from the Department. *See* Reproduced Record at 223a-225a, 471a-473a.

[7] The Pennsylvania Supreme Court has explained:

> The Charter School Law[, Act of March 10, 1949, P.L. 30, *as amended*, added by Section 1 of the Act of June 19, 1997, P.L. 225, 24 P.S. §§ 17-1701-A - 17-1751-A] . . . provides for the funding of charter schools by requiring a school district to pay the charter school for each student residing in the district who attends the charter school. If a school district fails to make the payment, the [Charter School Law] authorizes the Secretary . . . to deduct the appropriate amount from the state's payments to the district.

*Slippery Rock Area Sch. Dist. v. Pa. Cyber Charter Sch.*, 31 A.3d 657, 659 (Pa. 2011). In addition to the per-student amount a school district pays charter schools, the charter schools receive an additional payment for children requiring special education services. *See* Section 1725-A(a)(3) of the Charter School Law, 24 P.S. § 17-1725-A(a)(3).

> Accordingly, the conclusion presented by the clear and convincing evidence is that the proposed Amendment . . . is wholly inadequate to restore the [District] to financial stability and it must therefore be disapproved.

Trial Ct. August 25, 2015 Opinion at 11-12, Reproduced Record (R.R.) at 1714a-1715a.

The Receiver and the Department filed with the trial court on September 15, 2015, a revised joint petition to amend the Plan (Second Petition to Amend) and attached a revised recovery plan. The Second Petition to Amend described methods of addressing the District's negative fund balance, including proposed House Bill No. 1521 of 2015 (House Bill No. 1521),[8] which, if approved, would provide a one-time $25 million subsidy to the District. Further, the Second Petition to Amend contained an explanation that in the event the necessary additional funds were not appropriated, the Governor's Office was seeking a financial institution's commitment to refinance the District's negative fund balance on the District's behalf. The trial court held a hearing on the Second Petition to Amend on September 18, 2015. On September 22, 2015, the trial court granted the parties' request to withdraw the Second Petition to Amend based on a pending agreement between some brick-and-mortar charter schools and the Receiver, the District and the Department. Thereafter, three brick-and-mortar charter schools agreed to accept a rate for special education students below the statutorily-mandated rate and to forgive the District's past-due payments for the 2014-2015 school year.

On October 2, 2015, the District and the Department filed with the trial court a Revised Joint Petition to Amend Financial Recovery Plan (Third Petition to Amend) attaching a revised recovery plan (Revised Plan). Therein, they proposed that all District charter schools receive the same reduced special education rate

---

[8] As of the filing of this Opinion, House Bill No. 1521 has not been enacted.

4

accepted by the three District brick-and-mortar charter schools and that all District charter schools forgive all outstanding District debt owed to them for the 2014-2015 school year. As in the Second Petition to Amend, the Third Petition to Amend included reference to House Bill No. 1521.

On October 9, 2015, the trial court issued an opinion and order (October 9, 2015 Order) approving the Plan's modification insofar as the special education rates agreed to by the three District brick-and-mortar charter schools would be extended to all District charter schools. In addition, the trial court ordered the Commonwealth to provide the District with an additional $20 million in funding. In its opinion, the trial court placed the ultimate responsibility for the District's financial woes on the Commonwealth, concluding that the Commonwealth's funding of the District was severely inadequate due to the Governor's budget eliminating the Commonwealth's charter school reimbursements previously provided pursuant to Act 88 of 2002[9] (Act 88).[10] The Cyber Charter Schools, the District, the Receiver, the Department and the Secretary filed notices of appeal and cross-appeal from the trial court's October 9, 2015 and October 29, 2015 orders to this Court.[11]

---

[9] Act of June 29, 2002, P.L. 524 (relating, in pertinent part, to charter school funding).

[10] On October 29, 2015, the trial court issued an order clarifying that the trial court did not intend by its October 9, 2015 Order to require the Commonwealth to pay $20 million each year in increased funding. Rather, "[i]t intended an amount equal to the reduction in the tuition paid to the [c]harter [s]chools in each of the next ten (10) years." Trial Ct. October 29, 2015 Order at 1. The trial court also clarified that the initiative to forgive the District's charter school debt for the 2014-2015 school year was not approved for District charter schools not involved in the settlement with the District and the Department.

[11] "The interpretation of a statute raises a question of law, and in such instances, this Court's review is plenary." *Wagner v. Dep't of Transp., Bureau of Driver Licensing*, 931 A.2d 104, 106 (Pa. Cmwlth. 2007). Further, "[o]ur scope of review where the court below has held a *de novo* hearing is limited to a consideration of whether findings of fact are supported by substantial evidence and whether the law was properly applied to the instant facts." *Dep't of Transp., Bureau of Traffic Safety v. Volmer*, 398 A.2d 1098, 1100 (Pa. Cmwlth. 1979) (italics added). *See also Hornstein v. Lynn Twp. Sewer Auth.*, 866 A.2d 1192 (Pa. Cmwlth. 2005), *aff'd*, 895 A.2d 544 (Pa. 2006).

Agora, Commonwealth Connections Academy Charter School, Pennsylvania Cyber Charter School and Pennsylvania Virtual Charter School (collectively, Agora Parties) filed a joint brief with this Court (Agora Brief). Achievement House Cyber Charter School, PA Distance Learning Charter School, and PA Leadership Charter School (collectively, Achievement Parties), similarly filed a joint brief with this Court. The Cyber Charter Schools raise the following issues:[12] (1) whether the trial court erred when it authorized the Receiver to amend the Plan permitting the District to pay Charter Schools less than the statutorily-mandated special education rate; (2) whether the trial court erred when it approved the Plan modification because the modification was not adequate to restore the District to financial stability and was arbitrary and capricious; (3) whether Section 672-A of the School Code fails to provide adequate due process protections; (4) whether the trial court's interpretation of Section 672-A(c) of the School Code resulted in an unconstitutional delegation of legislative power; (5) whether the trial court erred by failing to find the Act unconstitutional on its face or as applied; and (6) whether the Act's passage violated the Pennsylvania Constitution's single subject[13] and original purpose[14] provisions.

The Department and the Secretary also filed a joint brief in support of their cross-appeal (Department Brief), wherein they raised three issues for this Court's review: (1) whether the trial court erred by holding that the School Code expressly permitted the Receiver to propose modifications to the charter school

---

[12] Given the similarity of the issues raised in the parties' briefs, this Court has consolidated and restated the issues for clarity and brevity.

[13] Article III, Section 3 of the Pennsylvania Constitution states: "No bill shall be passed containing more than one subject, which shall be clearly expressed in its title, except a general appropriation bill or a bill codifying or compiling the law or a part thereof." Pa. Const. art. III, § 3.

[14] Article III, Section 1 of the Pennsylvania Constitution provides: "No law shall be passed except by bill, and no bill shall be so altered or amended, on its passage through either House, as to change its original purpose." Pa. Const. art. III, § 1.

special education rates and implement those modifications after the trial court concluded that doing so would restore the District to financial stability; (2) whether the trial court erred by refusing to order forgiveness of the District's 2014-2015 Charter School funding debt; and (3) whether the trial court exceeded its authority by ordering the Commonwealth to provide the District with additional funding.

Finally, the District filed a brief in support of its cross-appeal, wherein it incorporated by reference the Department's arguments, except for the Department's assertion that the trial court erred by ordering the Department to provide the District additional funding.[15]

## Cyber Charter Schools' Arguments

## 1. Trial Court's Interpretation of Section 672-A(c)(3) of the School Code[16]

The Cyber Charter Schools argue that the trial court erred by conferring power on the Receiver to alter the statutorily-mandated special education rate, where the School Code does not authorize a receiver to exercise such authority. Specifically, the Cyber Charter Schools contend that the trial court misinterpreted Section 672-A(c)(3) of the School Code to grant the Receiver authority to disregard the District's legal obligation to pay Charter Schools the statutorily-mandated special education rate. In so doing, the Cyber Charter Schools maintain that the trial court improperly interpreted an **exception** to statutorily-**prohibited conduct** as affirmatively granting the Receiver the power to modify the statutory special education rate. The Cyber Charter Schools also assert that permitting the Receiver to

---

[15] The Agora Parties filed a second brief replying to the Department's brief and responding to the Department's cross-appeal. The District filed a second brief opposing the Commonwealth's cross-appeal. The Department filed a second brief addressing the issues raised by the District and the Cyber Charter Schools relating to the Department's cross-appeal.

[16] 24 P.S. § 6-672-A(c)(3).

7

require the Cyber Charter Schools to accept less than the statutorily-mandated special education rate per student is inconsistent with Section 681-A of the School Code which permits charter schools to **voluntarily** assist a school district in financial distress. Finally, the Cyber Charter Schools argue that the language, "unless otherwise ordered by a court of competent jurisdiction," contained in Section 672-A(c)(3) of the School Code refers to "an order previously granted by a different court." Agora Br. at 31.

Initially, we recognize that when interpreting the relevant statutes,

we are guided by the principles embodied in [the] Statutory Construction Act [ of 1972 (Statutory Construction Act), 1 Pa.C.S. §§ 1501-1991]. *P*[*a.*] *Gaming Control Bd. v. City Council of Phila*[*.*]*, . . .* 928 A.2d 1255, 1263 ([Pa.] 2007). The principally[-]relevant provisions of the Statutory Construction Act applicable to this matter are: Section 1921(a), which specifies that '[t]he object of all interpretation and construction of statutes is to ascertain and effectuate the intention of the General Assembly', and that '[e]very statute shall be construed, if possible, to give effect to all its provisions,' 1 Pa.C.S. § 1921(a); and Section 1921(b), which instructs: 'When the words of a statute are clear and free from all ambiguity, the letter of it is not to be disregarded under the pretext of pursuing its spirit,' *id.* § 1921(b).

The Statutory Construction Act also sets forth certain presumptions regarding the General Assembly's enactment of statutes which guide our interpretation in this instance, particularly that: '[w]ords and phrases shall be construed according to rules of grammar and according to their common and approved usage,' 1 Pa.C.S. § 1903(a); the legislature 'does not intend a result that is absurd, impossible of execution or unreasonable,' 1 Pa.C.S. § 1922(1); and the legislature intends the entirety of the statute to be certain, 1 Pa.C.S. § 1922(2). Additionally, if the General Assembly defines words that are used in a statute, those definitions are binding. *Young's Sales & Serv*[*.*] *v. Underground Storage Tank Indemnification B*[*d.*]*, . . .* 70 A.3d 795, 801 ([Pa.] 2013).

8

*SugarHouse HSP Gaming, LP v. Pa. Gaming Control Bd.*, 136 A.3d 457, 477 (Pa. 2016).

By way of background, Pennsylvania charter schools, including the Cyber Charter Schools, are funded in accordance with the Charter School Law.[17] The Pennsylvania Supreme Court has explained:

> Section []1725-A [of the Charter School Law[18]] places the burden to fund the education of a student enrolled in a cyber charter school on the school district of residence. The school district satisfies this obligation by making monthly payments to the charter school, **with the precise amount of the payment calculated from a statutory formula.**

*Slippery Rock,* 31 A.3d at 666 (citation omitted; emphasis added). Section 1725-A(a) of the Charter School Law states, in relevant part:

> (1) There shall be no tuition charge for a resident or nonresident student attending a charter school.
>
> (2) For non-special education students, the charter school shall receive for each student enrolled no less than the budgeted total expenditure per average daily membership of the prior school year, as defined in [S]ection 2501(20) [of the School Code, 24 P.S. § 25-2501(20)], minus the budgeted expenditures of the district of residence for nonpublic school programs; adult education programs; community/junior college programs; student transportation services; for special education programs; facilities acquisition, construction and improvement services; and other financing uses, including debt service and fund transfers as provided in the Manual of Accounting and Related Financial Procedures for Pennsylvania School Systems established by the department. This amount shall be paid by the district of residence of each student.
>
> (3) **For special education students, the charter school shall receive for each student enrolled the same funding**

[17] Act of March 10, 1949, P.L. 30, added by the Act of June 19, 1997, P.L. 225, *as amended*, 24 P.S. §§ 17-1701-A - 17-1751-A.
[18] 24 P.S. § 17-1725-A.

**as for each non-special education student as provided in clause (2), plus an additional amount determined by dividing the district of residence's total special education expenditure by the product of multiplying the combined percentage of [S]ection 2509.5(k)[, of the School Code, 24 P.S. § 25-2509.5(k),] times the district of residence's total average daily membership for the prior school year. This amount shall be paid by the district of residence of each student.**

. . . .

(5) Payments shall be made to the charter school in twelve (12) equal monthly payments, by the fifth day of each month, within the operating school year. . . .

24 P.S. § 17-1725-A(a) (emphasis added). Thus, Pennsylvania school districts are statutorily-mandated to pay charter schools for the education of enrolled students from their districts, and to pay additional amounts for students receiving special education services.

When a Pennsylvania school district is in financial distress, the School Code provides a comprehensive statutory scheme to move the school district to fiscal stability. Section 621-A of the School Code directs the Secretary, after an appropriate investigation, to declare a school district in financial recovery if the school district meets certain enumerated criteria. *See* 24 P.S. § 6-621-A. Within five days thereafter, the Secretary must appoint a chief recovery officer. *See* 24 P.S. § 6-631-A. Section 633-A of the School Code sets forth the chief recovery officer's duties and powers which include developing and implementing a financial recovery plan. *See* 24 P.S. § 6-633-A. Section 642-A(a) of the School Code grants a school district in financial recovery or receivership

the following powers only to the extent that the powers are specifically included in the school district's financial recovery plan and the exercise of the powers will effect needed economies in the operation of the district's schools:

10

(1) Reopen its budget for the current school year, notwithstanding any other provision of law.

(2) Convert school buildings to charter schools. . . .

(3) Cancel or renegotiate any contract to which the board of school directors or the school district is a party, if the cancellation or renegotiation of contract will effect needed economies in the operation of the district's schools. . . .

(4) Increase tax levies in such amounts and at such times as is recommended by the chief recovery officer, subject to the . . . Taxpayer Relief Act.[19]

(5) Appoint a special collector of delinquent taxes . . . .

(6) Dispense with the services of such nonprofessional employees . . . .

(7) Enter into agreements with persons or for-profit or nonprofit organizations to operate one or more schools. . . .

(8) Suspend or revoke a charter under [S]ection 1729-A [of the Charter School Law].

(9) Employ [uncertified] professional and senior management employees . . . if the [S]ecretary has approved the qualifications . . . .

(10) Enter into agreements . . . [for] . . . noninstructional or other services . . . .

(11) Close or reconstitute a school, including the reassignment, suspension or dismissal of professional employees.

(12) Appoint managers, administrators or for-profit or nonprofit organizations to oversee the operations of a school or group of schools within the school district.

(13) Reallocate resources, amend school procedures, develop achievement plans and implement testing or other evaluation procedures for educational purposes.

---

[19] Act of June 27, 2006, P.L. 1873, No. 1 (Spec. Sess. No. 1), *as amended,* 53 P.S. §§ 6926.101 through 6926.5006.

(14) Supervise and direct principals, teachers and administrators.

(15) Negotiate a new collective bargaining agreement if the negotiation of a new collective bargaining agreement will effect needed economies in the operation of the district's schools.

(16) Delegate . . . powers the chief recovery officer deems necessary to carry out the purposes of this article, subject to the supervision and direction of the chief recovery officer.

(17) Employ . . . organizations to review the financial and educational programs of school buildings and make recommendations to the chief recovery officer regarding improvements to the financial or educational programs of school buildings.

(18) Negotiate a contract with a charter school under [S]ection 681-A(f) [of the School Code].

24 P.S. § 6-642-A(a).

Section 671-A(a) of the School Code requires the Secretary to petition a court to appoint a receiver if the school board directors fail to approve or implement a financial recovery plan developed by the chief recovery officer. 24 P.S. § 6-671-A(a). Pursuant to Section 672-A(a) of the School Code, a receiver so appointed assumes the chief recovery officer's powers (granted under Section 633-A of the School Code)[20] and those of the school board directors (conferred under Section 642-

---

[20] Section 633-A of the School Code, which describes the chief recovery officer's duties and responsibilities, provides:

> Subject to [the school district's board of directors' approval of a resolution cooperating with the chief recovery officer as set forth in] [S]ection 662-A [of the School Code], the chief recovery officer shall:
>
> (1) With the assistance of the [D]epartment, develop, implement and administer a financial recovery plan in accordance with Subdivision (iii).
>
> (2) Coordinate the [D]epartment's provision of technical assistance to the financial recovery school district under [S]ection 626-A [of the School Code].

12

A of the School Code).[21] *See* 24 P.S. § 6-672-A(a). The receiver is also granted the following additional powers and responsibilities under Section 672-A(b) of the School Code:

> (1) Implement the financial recovery plan attached to the petition filed under [S]ection 671-A(a) [of the School Code].
>
> (2) Submit quarterly reports to the [S]ecretary, superintendent and board of school directors of the school district concerning the progress of the school district under the financial recovery plan. . . .
>
> (3) Direct employees and appointed officials of the school district to take actions that, in the judgment of the receiver, are necessary to implement the financial recovery plan and to refrain from taking actions that, in the judgment of the receiver, would impede the implementation of the plan.
>
> (4) Direct the board of school directors to levy and raise taxes.
>
> (5) Modify the financial recovery plan as necessary to restore the school district to financial stability by submitting

---

(3) Maintain oversight of the financial recovery school district during the transition period under [S]ection 625-A [of the School Code].

(4) Attend regular and executive sessions of the board of school directors.

(5) When a receiver is appointed to oversee the management of the financial recovery school district under Subdivision (vi), serve as an advisor to the receiver.

(6) Where an advisory committee is established under [S]ection 654-A [of the School Code], meet at least monthly with the advisory committee.

(7) In a financial recovery school district to which [S]ection 654-A [of the School Code] does not apply, conduct at least four public forums on the basis for the financial recovery declaration and the development and implementation of a financial recovery plan.

24 P.S. § 6-633-A.

[21] The receiver's powers also include "all powers and duties of the board of school directors stated in the financial recovery plan." 24 P.S. § 6-672-A(a)(1).

a petition to the court of common pleas. Within seven days of the filing of the petition, the court of common pleas shall issue a decision approving or disapproving the petition. The court of common pleas shall approve the modification, unless the court finds by clear and convincing evidence that the modification is arbitrary, capricious or wholly inadequate to restore the school district to financial stability.

(6) Employ financial or legal experts the receiver deems necessary to implement or modify the financial recovery plan. . . .

(7) Attend regular and executive sessions of the board of school directors of the school district.

(8) Petition the court of common pleas in the county in which the school district or the largest part in area of the school district is located to issue a writ of mandamus upon any employee or elected or appointed official of the school district to secure compliance with a directive of the receiver issued under paragraph (3) or (4). . . .

(9) Meet at least monthly with the advisory committee, where an advisory committee has been established . . . .

24 P.S. § 6-672-A(b). Notwithstanding the broad authority the General Assembly conferred upon a receiver, Section 672-A(c) of the School Code expressly limits a receiver's powers as follows:

**Prohibited activity.--**Nothing in this subarticle or the financial recovery plan shall be construed to authorize the receiver to do any of the following:

(1) Unilaterally levy or raise taxes.

(2) Unilaterally abrogate, alter or otherwise interfere with a lien, charge, covenant or relative priority that is:

(i) Held by a holder of a debt obligation of a school district.

(ii) Granted by the contract, law, rule or regulation governing the debt obligation.

14

> (3) **Unilaterally impair or modify** existing bonds, notes, school district securities or other lawful contractual or **legal obligations of the school district**, *except as otherwise ordered by a court of competent jurisdiction* or as provided in [S]ection 642-A(a)(3) [of the School Code (relating to canceling or renegotiating contracts)].

24 P.S. § 6-672-A(c) (bold and italic emphasis added). With this foundation, the Court considers the Cyber Charter Schools' allegations of legal error with respect to the trial court's interpretation and application of Section 672-A(c)(3) of the School Code.

## Whether Section 672-A(c)(3) of the School Code Contains an Affirmative Grant of Authority to a Receiver.

The Cyber Charter Schools assert there is no statutory authority permitting a receiver to modify statutorily-mandated special education payments, even with trial court approval. They contend that the trial court's interpretation of Section 672-A(c)(3) of the School Code that the Receiver is authorized to modify the District's legal obligation to the Cyber Charter Schools under the Charter School Law, improperly created an additional and unauthorized affirmative Receiver power that is not founded in the School Code.

The Cyber Charter Schools argue that Section 672-A(c)(3) of the School Code is an **exception to a restriction** on conduct that does not affirmatively grant the Receiver additional power to modify legal obligations. They posit that Section 672-A(a) and (b) of the School Code (incorporating Sections 642-A and 633-A of the School Code) grants the Receiver powers, while Section 672-A(c) of the School Code, entitled "**Prohibited [A]ctivity[,]**" **restricts** a receiver's powers.[22] 24 P.S. § 6-

---

[22] This Court acknowledges that Section 1924 of the Statutory Construction Act states, in relevant part, "[t]he headings prefixed to titles, parts, articles, chapters, sections and other divisions of a statute shall not be considered to control but may be used to aid in the construction thereof." 1 Pa.C.S. § 1924.

15

672A(c). Accordingly, they reason that Section 672-A(c) of the School Code's purpose is to limit a receiver's powers, not to expand them beyond those granted in Section 672-A(a) and (b) of the School Code. The Department responds that the clear and unambiguous statutory language grants the Receiver and the trial court such authority.

The entirety of Section 672-A(c) of the School Code pertains to and limits a receiver's powers granted "in this subarticle or the financial recovery plan[.]" 24 P.S. § 672-A(c). Specifically, Section 672-A(c)(3) of the School Code prohibits a receiver, in exercising his/her powers, from, *inter alia*, unilaterally impairing or modifying legal obligations, **unless** a court of competent jurisdiction rules otherwise or as provided in Section 642-A(a)(3) of the School Code. 24 P.S. § 6-672-A(c)(3).

Thus, consistent with the Cyber Charter Schools' contentions, Section 672-A(c)(3) of the School Code does not **affirmatively grant** the Receiver authority to modify a legal obligation. **The Receiver's powers stem from Section 672-A(a) and (b) of the School Code**, which incorporates the powers and duties contained in Sections **642-A and 633-A** of the School Code. On the other hand, Section 672-A(c)(3) of the School Code imposes a **limitation** on those powers and duties which may be lifted by a court of competent jurisdiction. Accordingly, a trial court may authorize action impairing or modifying legal or contractual obligations **only** if the Receiver is acting pursuant to powers granted under Section 672-A(a) and (b) of the School Code (incorporating Sections 642-A and 633-A of the School Code).

Even, assuming arguendo, that Section 672-A(c)(3) of the School Code creates an affirmative power in the Receiver to "impair or modify . . . legal obligations of the school district," the statutorily-mandated charter school payments are not the type of "legal obligation" contemplated by Section 672-A(c)(3) of the School Code. 24 P.S. § 6-672-A(c)(3). "Under our venerable statutory construction

16

doctrine of *ejusdem generis* ('of the same kind or class'), where specific terms setting forth enumeration of particular classes of persons or things follow general terms, the general words will be construed as applicable only to persons or things of the same general nature or class as those enumerated." *Dep't of Envtl. Prot. v. Cumberland Coal Res., LP*, 102 A.3d 962, 976 (Pa. 2014). The preceding terms "existing bonds, notes, school district securities" are very different from payments mandated by statute. 24 P.S. § 6-672-A(c)(3). Thus, under the well-established *ejusdem generis* doctrine, the term "legal obligation" cannot include the District's statutorily-mandated special education charter school payments.

The most relevant powers the School Code grants to a receiver as they relate hereto, include the following authority: To "[c]ancel or renegotiate any contract to which the board of school directors or the school district is a party, if the cancellation or renegotiation of contract will effect needed economies in the operation of the district's schools[;]" "[e]nter into agreements with persons or for-profit or nonprofit organizations to operate one or more schools[;]" "[s]uspend or revoke a charter under [S]ection 1729-A [of the Charter School Law;]" "[a]ppoint managers, administrators or for-profit or nonprofit organizations to oversee the operations of a school or group of schools within the school district[;]" and "[r]eallocate resources, amend school procedures, develop achievement plans and implement testing or other evaluation procedures for educational purposes." 24 P.S. §§ 6-642-A(a)(3), (7), (8), (12), (13).

This Court discerns no provision under the aforementioned School Code sections which affirmatively authorize the Receiver to **unilaterally** modify the Charter School Law's mandate. The trial court's reliance on Section 672-A(c) of the School Code to permit the Receiver to exercise a power not explicitly granted to the Receiver under Section 6-672A(a) and (b) (incorporating Sections 633-A and 642-A)

17

of the School Code is misplaced. There is no authority under the School Code affirmatively permitting the Receiver to unilaterally impose self-determined special education rates in contravention of the Charter School Law's mandate, even with the trial court's approval. Therefore, this Court concludes that the trial court erred by approving the Plan modification to alter the statutorily-mandated special education rates.[23]

### Whether the Trial Court's Interpretation of Section 672-A(c)(3) of the School Code is Erroneous Since it is Inconsistent with Section 681-A of the School Code.

The Cyber Charter Schools also contend that the trial court's interpretation of the Receiver's authority under Section 672-A(c)(3) of the School Code permitting the Receiver to involuntarily require the Cyber Charter Schools to assist the District in meeting its financial obligations, is inconsistent with Section 681-A of the School Code and, therefore, is erroneous.

The Pennsylvania Supreme Court has explained:

> A fundamental principle in statutory construction is that we must read statutory sections harmoniously. Parts of a statute that are in pari materia, *i.e.*, statutory sections that relate to the same persons or things or the same class of persons and things, are to be construed together, if possible, as one statute. 'If they can be made to stand together[,] effect should be given to both as far as possible.' [*Commonwealth v.*] *Office of Open Records*, 103 A.3d [1276,] 1284 [(Pa. 2014)] (quoting *Kelly v. City of Phila*[.], . . . 115 A.2d 238, 245 ([Pa.] 1955)). In ascertaining legislative intent, statutory language is to be interpreted in context, with every statutory section read 'together and in conjunction' with the remaining statutory language, 'and construed with reference to the entire statute' as a whole. *B*[*d.*] *of Revision of Taxes, City of Phila*[.] *v. City of*

---

[23] Although the Court holds that the trial court erred, the Court will nevertheless discuss the Cyber Charter Schools' and the Department's remaining substantive legal arguments in order to provide guidance for proceedings on remand.

> *Phila*[.], . . . 4 A.3d 610, 622 ([Pa.] 2010). We must presume that in drafting the statute, the General Assembly intended the entire statute, including all of its provisions, to be effective. Importantly, this presumption requires that statutory sections are not to be construed in such a way that one section operates to nullify, exclude or cancel another, unless the statute expressly says so.

*In re Tr. Under Agreement of Taylor*, 164 A.3d 1147, 1157 (Pa. 2017) (citations omitted).

Section 681-A(a) of the School Code establishes the Financial Recovery Transitional Loan Program (Program) under which the Department provides loans to school districts that satisfy criteria for financial recovery status under Section 621-A(a)(1)(i) of the School Code, and whose boards of school directors have approved a financial recovery plan under Section 652-A(c) or Section 663-A(c) of the School Code. *See* 24 P.S. § 6-681-A(a). Section 681-A(f) of the School Code, titled "**Voluntary [A]greement**" states:

> (1) A school district that receives a loan under this subdivision **may enter into a voluntary agreement** with one or more charter schools in which students residing within the school district are enrolled, which agreement provides that the charter school may give the school district funds to assist the school district in repayment of the loan.
>
> (2) Any amount provided by the charter school under this subsection shall be **in an amount agreed upon** by the charter school and the school district.

24 P.S. § 6-681-A(f) (emphasis added).

The Cyber Charter Schools explain that the Department loaned the District $10 million, that the loan was identified in the hearings as a portion of the debt that the District was having difficulty repaying, and that the trial court's mandated reduction of the required statutory special education payments was, in effect, an involuntary directive to the Cyber Charter Schools to assist the District in

19

repaying the loan. Because Section 681-A(f)(1) of the School Code provides that charter schools "may enter into a **voluntary** agreement" to assist a distressed school district in repaying the loans, the Cyber Charter Schools argue that they may not be forced to do so through a reduction in the statutorily-mandated special education rates. 24 P.S. § 6-681(f)(1) (emphasis added). According to the Cyber Charter Schools, interpreting the School Code to permit the Receiver to require the Cyber Charter Schools to **involuntarily** "assist the [District] in repayment of the loan" (by reducing the District's required per student statutorily-mandated payments) would render the word "voluntary" in Section 681-A(f)(1) of the School Code meaningless. 24 P.S. § 6-681(f)(1).

Importantly, one of the powers explicitly granted to a school district under Section 642-A of the School Code and thereby incorporated into the Receiver's powers under Section 672-A of the School Code is the authority to "[**n**]**egotiate**[24] a contract with a charter school under [S]ection 681-A(f) [of the School Code]."[25] 24 P.S. § 6-642-A(a)(18) (emphasis added). By creating Section 681-A(f) of the School

---

[24] *Merriam-Webster's Collegiate Dictionary* (11th ed. 2004) defines the word "negotiate," in part, as "to arrange for or bring about through conference, discussion, and **compromise**[.]" *Id.* at 830 (emphasis added).

[25] The General Assembly did not neglect to consider ways in which charter schools could assist financially-distressed school districts, but rather, granted such school districts the ability to **negotiate** with charter schools for assistance in repaying a Program loan. Despite its obvious attention to such matters, the General Assembly did not explicitly grant a receiver the ability to disregard the detailed funding formula mandated in Section 1725-A(a) of the Charter School Law.

> [W]e are mindful of the precept that courts cannot insert words into a statute. Thus, we may not, under the guise of statutory construction, simply rewrite [a statutory section] . . . . *See Karoly v. Mancuso*, . . . 65 A.3d 301, 309 n.7 ([Pa.] 2013) (referencing the 'established precept that it is improper for this Court to supply legislative omissions'); *Commonwealth v. Shafer*, . . . 202 A.2d 308, 312 ([Pa.] 1964) (same, even where the omission may have resulted from inadvertence).

*Burke v. Indep. Blue Cross*, 103 A.3d 1267, 1274 (Pa. 2014).

Code, which permits charter schools to **voluntarily** agree to give the school district funds to assist them in repayment of a Program loan, and allowing a receiver to "[n]egotiate" such a contract with charter schools, the General Assembly provided a method for charter schools to assist school districts in financial recovery status. 24 P.S. § 6-642-A(a)(18); *see also* 24 P.S. § 6-681-A(f)(1). The use of the terms "[n]egotiate" in Section 642-A(a)(18) of the School Code and "voluntary agreement" in Section 681-A(f)(1) of the School Code evidences the General Assembly's intent that charter schools not be compelled to assist a school district in financial recovery. Section 681-A(f)(2) of the School Code further reflects this intent by requiring that any such monies charter schools provide to a school district "shall be in **an amount agreed upon by the charter school** and the school district." 24 P.S. § 6-681-A(f)(2) (emphasis added). The trial court's approval of what was effectively a statutory modification permitting the Receiver to mandate that the Cyber Charter Schools financially assist the District, was inconsistent with Section 681-A of the School Code. Because the trial court's interpretation of the Receiver's authority under Section 672-A of the School Code is incompatible with Section 681-A of the School Code, the trial court erred when it approved the Plan modification permitting the alteration of statutorily-mandated per-student rates.[26]

---

[26] Relying on *Federal Deposit Insurance Corp. v. Board of Finance and Revenue*, 84 A.2d 495 (Pa. 1951), the Cyber Charter Schools also argue that Section 672-A(c)(3) of the School Code, which prohibits a receiver from unilaterally impairing, *inter alia*, lawful contractual or legal obligations of a school district "unless otherwise ordered by a court of competent jurisdiction[,]" refers to "an order previously granted by a different court." Agora Br. at 31. *Federal Deposit* is distinguishable from the instant case. Therein, the applicable statute extended the time to request a tax refund "[w]hen any tax or other money has been paid to the Commonwealth, under a provision of an act of Assembly **subsequently held by final judgment of a court of competent jurisdiction** to be unconstitutional, or under an interpretation of such provision **subsequently held by such court to be erroneous**." *Fed. Deposit*, 84 A.2d at 497 (quoting Section 503 of the Fiscal Code, Act of April 9, 1929, P.L. 343, 72 P.S. § 503, repealed in part by the Act of June 15, 1961, P.L. 373) (emphasis added). There is no such similar language in the School Code's relevant provisions. Instead, Section 672-A(c) of the School Code simply prohibits a receiver from "[u]nilaterally

21

**2. Plan Adequacy**

The Cyber Charter Schools also argue that the trial court erred when it approved the Plan's modification, because a trial court is required to reject a modification when there is "clear and convincing evidence that the modification is arbitrary, capricious or wholly inadequate to restore the school district to financial stability." 24 P.S. § 6-672-A(b)(5).

In support of their argument, the Cyber Charter Schools reference the trial court's conclusion that the District's financial obligation to charter schools was not the root cause of the District's financial deficiencies, but rather the lack of adequate funding caused by the elimination of Act 88 reimbursements,[27] insufficient

---

impair[ing] or modify[ing] existing bonds, notes, school district securities or other lawful contractual or legal obligations of the school district, **except as otherwise ordered by a court of competent jurisdiction** or as provided in [S]ection 642-A(a)(3) [of the School Code]." 24 P.S. § 6-672-A(c)(3) (emphasis added). The plain language of Section 672-A(c) of the School Code does not mandate that a receiver's action be based on a then-existing final judgment or judicial ruling. Accordingly, this argument is without merit. Notwithstanding, for the above-stated reasons, "except as otherwise ordered . . ." does not give the Receiver or the trial court the authority to order a change to the Charter School Law. 24 P.S. § 6-672-A(c)(3).

[27] The trial court placed the District's financial instability squarely on the Commonwealth and questioned the Commonwealth's policy decisions, explaining:

> The elimination of Act 88 from the budgeting from [the District] had a devastating and immediate impact. Despite that and the need to address that dramatic cut in funding, the administration continues with the echoes from the past to trumpet over and over that the Commonwealth had to give special appropriations of 75 million dollars implying some sort of mismanagement and an exasperation at the level of charity it is providing [the District] and that it is some sort of poor cousin, charity case rather than accepting that [the District] had the rules changed on it. These appropriations and infusions are not charity to the poor children of [the District]. They are actually direct evidence of the [Commonwealth] underfunding [the District] by at least those sums, sums that should have been in the budget in the first place. They are direct evidence of the [Commonwealth] not meeting its [c]onstitutional and [s]tatutory obligation to properly fund all students in this Commonwealth regardless of background.

Trial Ct. October 9, 2015 Opinion at 19, R.R. at 5799a.

22

tax base and the District's outstanding debt was the cause thereof. Given the actual causes of the District's insufficient finances, the Cyber Charter Schools assert that the District failed to consider implementing effective methods to address them. They further contend that the Revised Plan is inadequate as demonstrated by the fact that even with the trial court's approval of the Plan modification, the District will have insufficient funds to complete the school year. The Cyber Charter Schools also maintain that the trial court's order (which the Cyber Charter Schools argue, "likely . . . exceeded [the trial court's] authority") requiring the Commonwealth to pay the District $20 million is proof that the Revised Plan was woefully insufficient to return the District to financial stability.[28] Agora Br. at 65.

---

[28] A financial recovery plan must:

> (1) Provide for the delivery of effective educational services to all students enrolled in the financial recovery school district.
>
> (2) Provide for the payment of lawful financial obligations of the financial recovery school district.
>
> (3) Provide for the timely deposit of required payments to the Public School Employees' Retirement Fund.
>
> (4) Provide a plan for the financial recovery school district's return to financial stability[.]
>
> (5) Set forth a cash flow analysis for the financial recovery school district.
>
> (6) State projections of revenues and expenditures for the current year and the next two years, both assuming the continuation of present operations and as impacted by the measures included in the financial recovery plan.
>
> (7) State benchmarks and timelines for restoring the financial recovery school district to financial stability.
>
> (8) Require the financial recovery school district to use financial data software that is connected directly to the department's financial data systems to ensure that both the financial recovery school district and the department are using accurate and consistent data. All costs of the financial data software required to be used by the financial recovery school district under this paragraph shall be paid by the [D]epartment.

23

Specifically, the Cyber Charter Schools argue:

The [Revised Plan] filed by the Department and the District did not fix this problem. The [Revised P]lan noted that three charter schools agreed to forgive a total of $7.3 million in payments owed to them by the District for the 2014-2015 school year. It asked that this purportedly voluntary debt reduction be imposed on other charter schools as well, which would create a total debt reduction of $8.6 million.

By the District's own admission, this would still leave the District with a negative fund balance of $17.1 million, of which $3.4 million was owed to the public employees retirement system, $868,739 was owed for health care, and $11.4 million was owed to 'other.' No forgiveness of these other amounts was proposed. Instead, the Department and the District proposed that either $25 million would be provided to the District by the Commonwealth through a bill proposed by a state representative or that the negative fund balance would be refinanced, resulting in additional payments of $2 million a year by the District. The proposed

---

(9) Establish specific criteria that the financial recovery school district must satisfy before the [S]ecretary may terminate the financial recovery school district's financial recovery status under [S]ection 624-A [of the School Code]. Such criteria shall include, but shall not be limited to:

(i) The financial recovery school district does not request an advance of its basic education subsidy.

(ii) All teacher and other employee salaries are paid when due.

(iii) The financial recovery school district is not in default on any bonds, notes or lease rentals and is not subject to withholding by the [S]ecretary under [S]ection 633 [of the School Code].

(iv) The financial recovery school district does not satisfy the criteria stated in regulations promulgated under [S]ection 621-A(a)(2) [of the School Code].

(v) The financial recovery school district is making progress toward financial stability.

24 P.S. § 6-641-A.

24

bill has not been enacted into law and the proposed financing has not been obtained.

Agora Br. at 63 (citations omitted).

Importantly, the trial court acknowledged that "[t]he [Revised Plan], even with the huge $20 million concession of the [c]harter[ schools], instead of further funding the District, will continue to further underfund it." Trial Ct. October 9, 2015 Opinion at 12. The trial court expounded:

> The Commonwealth['s] plan in essence is to make up the difference created by eliminating the Act 88 funding by shifting funding for the charters over to [the District] and by proposing increasing funding every year. The [Revised Plan] has partially done that. It got concessions from the [charter schools] for 20 million dollars this year and for 11.2 million [dollars] in the next 10 from the [charter schools.] It has increased basic education funding by 8.6 million dollars. However, Act 88 funding would have provided 25.6 million [dollars] this year and in subsequent years.

Trial Ct. October 9, 2015 Opinion at 17-18, R.R. at 5797a-5798a. Notwithstanding, the trial court ultimately held: "The [Revised P]lan itself and the record established on this case has all the elements needed to address and resolve the fiscal 'structural' and 'negative fund balance' deficit." *Id*. at 19.

Critically, the trial court's order included far more than that proposed in the Revised Plan. The trial court also ordered, *sua sponte*, that the Commonwealth pay $20 million to the District.[29] This mandate reflects that the trial court believed

---

[29] The trial court explained its rationale for imposing the $20 million Commonwealth payment:

> The settlement reached with the Brick and Mortar [c]harter[ schools] would take 20 million from the [c]harter[ schools] and make[] it available now for use by [the District]. This is a huge concession made by the [c]harter[ schools]. And yet, the Commonwealth in return does not as part of the [Revised P]lan take the elimination of a 20 million dollar commitment and match it with its own concessions

25

that such substantial **additional relief** was **necessary** and, thus, demonstrates that the Revised Plan, as proposed, was "wholly inadequate to restore the school district to financial stability." 24 P.S. § 6-672-A(b)(5). Therefore, even if this Court had found that the trial court properly interpreted Section 672-A(c)(3) of the School Code, it would have concluded that the trial court erred by approving the Plan modification because it was clearly insufficient to move the District to financial stability.[30]

## Department's Arguments

### 1. Trial Court's Authority to Mandate Additional Funding

The Department contends that the trial court erred when it ordered the Commonwealth to pay $20 million to the District.[31] It proffers three arguments in

---

> and commitment of more funds for [the District]. The budgeted sum the Commonwealth has committed to [the District] remains the same before and after the 20 million dollar concession. It seems that equity would require that the Commonwealth's commitment for 2015-[20]16 should be increased to match the extraordinarily generous 20 million dollar commitment made by the [c]harter[ schools]. The Commonwealth should take that 20 million dollars it has taken from the [c]harter[ schools], using this court's opinion as leverage and then pay an equal sum to the District to increase the funding for the District.

Trial Ct. October 9, 2015 Opinion at 9, R.R. at 5789a. Whether the trial court had authority to order such a payment is addressed *infra*.

[30] Having concluded that the trial court erred when it approved the Plan modification, this Court does not address the Cyber Charter Schools' challenges to the Act's constitutionality, because the law is well-established that "courts should avoid constitutional issues when the issue at hand may be decided upon other grounds." *In re Fiori*, 673 A.2d 905, 909 (Pa. 1996); *see also Commonwealth v. Herman*, 161 A.3d 194 (Pa. 2017); *Cary v. Bureau of Prof'l & Occupational Affairs, State Bd. of Med.*, 153 A.3d 1205 (Pa. Cmwlth. 2017).

[31] Because this Court has already rejected the Department's first argument by concluding that the trial court improperly held that the Act permitted the Receiver to modify statutorily-mandated special education rates with trial court approval, this Court addresses the Department's two remaining arguments.

26

support of its position. First, the General Assembly permitted the trial court only to approve or disapprove the Plan modification and that the trial court lacked authority to impose additional obligations beyond those proposed in the Revised Plan. Second, the adequacy of school funding levels is a nonjusticiable political issue. Third, the trial court's *sua sponte* order mandating the additional funding denied the Department due process.

Section 672-A(b)(5) requires a court of common pleas to "issue a decision **approving or disapproving** the petition. The court of common pleas shall approve the modification, unless the court finds by clear and convincing evidence that the modification is arbitrary, capricious or wholly inadequate to restore the school district to financial stability." 24 P.S. § 6-672-A(b)(5) (emphasis added). Accordingly, the Department concludes that, in accordance with the statute, the trial court was permitted to either approve or disapprove the Third Petition to Amend, but not to, *sua sponte*, order the Commonwealth to pay the District $20 million.

The matter before the Court is analogous to the issue addressed by this Court in *Becker's Café, Inc. v. Pennsylvania Liquor Control Board*, 67 A.3d 885 (Pa. Cmwlth. 2013). There, a licensee appealed from the Pennsylvania Liquor Control Board's (PLCB) denial of its renewal application to the county common pleas court, which reversed the PLCB's decision and granted renewal of the license. However, the court also imposed a restriction on the premises' operation.

Arguing that the Liquor Code[32] did not authorize the common pleas court to do so, both the licensee and the PLCB challenged the common pleas court's authority to impose a condition on the license renewal. After review, this Court held:

> The trial court draws its authority to review, *de novo*, a refusal by the [PLCB] to renew a liquor license from Section 464 of the Liquor Code. 47 P.S. § 4-464. There is

---

[32] Act of April 12, 1951, P.L. 90, *as amended*, 47 P.S. §§ 1-101 - 10-1001.

> no express authority in Section 464 [of the Liquor Code] that permits a trial court to impose a condition on a renewal of a liquor license. Section 464 [of the Liquor Code] only authorizes a trial court to 'either sustain or over-rule the action of the [PLCB] and either order or deny the issuance of a new license or the renewal or transfer of the license . . . to the applicant.' *Id.*

*Becker's Café*, 67 A.3d at 893-94.[33]

Similarly, Section 672-A(b)(5) of the School Code authorizes a common pleas court to "issue a decision **approving or disapproving** the petition." 24 P.S. § 6-672-A(b)(5) (emphasis added). The trial court "draws its authority" therefrom. *Becker's Café,* 67 A.3d at 893. Section 672-A(b)(5) of the School Code does not authorize the trial court to modify the Revised Plan,[34] to add additional provisions, or to fashion its own plan, and this Court can find no other authority in the School Code permitting the trial court to do so.[35]

---

[33] *See also In re Private Sale of Prop. By the Millcreek Twp. Sch. Dist.*, 185 A.3d 272, 292 (Pa. 2018) (Pursuant to Section 707 of the School Code, which requires that a sale of an unused or unnecessary school building is "subject to the approval of the court of common pleas of the county in which the school district is located[,]" 24 P.S. § 7-707, "the trial court's only role is to approve or disapprove the sale presented for its consideration. It is not the trial court's function either to select the buyer . . . or . . . to direct the [s]chool [b]oard to conduct a public, rather than a private, sale."); *In re Bd. of Pub. Educ.*, 376 A.2d 1009, 1010 (Pa. Cmwlth. 1977) (quoting *Swift v. Abington Sch. Dist.*, 297 A.2d 538, 540 (Pa. Cmwlth. 1972)) ("The statute gives the court the power to approve or disapprove a private sale made by the board. The statute gives the court no power to negotiate for a better price, make a new sale or conduct an auction.").

[34] *Compare* Section 672-A(b)(5) of the School Code, *with* Section 516(d) of the Insurance Department Act of 1921 (Insurance Act), Act of May 17, 1921, P.L. 789, *as amended*, 40 P.S. § 221.16(d) ("[T]he court may either approve or disapprove the plan proposed, **or may modify it and approve it as modified.**") (emphasis added). As demonstrated by Section 516(d) of the Insurance Act, the General Assembly knew how to authorize the trial court to modify the Revised Plan, if it so intended. Notably, unlike Section 516(d) of the Insurance Act, the trial court's authority under Section 672-A(b)(5) of the School Code as granted by the General Assembly does not include the authority to modify a plan.

[35] *See* Sections 625-A, 634-A, 652-A, 663-A, 671-A, 672-A, 674-A, 675-A, 681-A, and 682-A of the School Code, 24 P.S. §§ 6-625-A, 6-634-A, 6-652-A, 6-663-A, 6-671-A, 6-672-A, 6-674-A, 6-675-A, 6-681-A, 6-682-A.

28

Notwithstanding, the District and the Receiver argue that the trial court properly exercised equitable powers in ordering additional funding for the District. This Court has explained:

> Where . . . the parties' rights are regulated and fixed by a comprehensive statutory scheme, the maxim, 'equity follows the law,' is applicable. *First Fed*[.] *Sav*[.] *& Loan Ass'n* [*of Lancaster*] *v. Swift*, . . . 321 A.2d 895 ([Pa.] 1974). . . . A court simply 'cannot devise a remedy which is inconsistent with existing legislation.' *Armstrong Sch*[.] *Dist*[.] *v. Armstrong Educ*[.] *Ass'n*, . . . 291 A.2d 125, 128 ([Pa. Cmwlth.] 1972).

*Commonwealth v. 6969 Forest Ave.*, 713 A.2d 701, 705 (Pa. Cmwlth. 1998). Under the School Code, a receiver's powers, and the trial court's role are "regulated and fixed by a comprehensive statutory scheme[.]" *Id*. Accordingly, the trial court in this case did not have authority to "devise a remedy which [was] inconsistent with existing legislation." *Id*. Based on the School Code's clear language, the trial court was without authority to, *sua sponte*, direct the Commonwealth to pay the District $20 million. Its imposition of such obligation was error.[36]

## 2. Trial Court's Refusal to Order Forgiveness of the District's 2014-2015 Charter School Funding Debt

The Department also argues that the trial court erred when it refused to approve the Revised Plan's proposal to grant the District "forgiveness" from the District's 2014-2015 charter school funding debt.[37] Department Br. at 59. Having

---

[36] Having concluded that the trial court had no authority to direct the Commonwealth to pay $20 million to the District, this Court need not address the Department's other arguments with respect thereto.

[37] The District references "the [Third Petition to Amend's] initiative to **forgive** [the District's charter school funding debt.]" District Br. at 59 (emphasis added). That characterization is inaccurate. The Receiver did not request **the creditors** to "forgive" the District's indebtedness. *Id*. Rather, the Receiver asked the **trial court** to eliminate the legal obligation the District had incurred and deny the Charter Schools monies due and owing over the Cyber Charter Schools' objections.

already concluded that Section 672-A(c)(3) of the School Code is not an affirmative grant of authority to the Receiver to set aside legal obligations, and no enumerated power authorizes the Receiver to extinguish existing debts incurred pursuant to a statutory mandate, the trial court did not err when it refused to order forgiveness of the District's 2014-2015 financial obligations to the District's charter schools. *See* 24 P.S. § 6-672-A(b)(5).

For all of the above reasons, the trial court's October 9, 2015 and October 29, 2015 orders are reversed, and the matter is remanded for review of the Revised Plan within the parameters of this Opinion.

_____
ANNE E. COVEY, Judge

Judge Fizzano Cannon did not participate in the decision in this matter.

30

# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

| | | |
|---|---|---|
| In Re: Appointment of a Receiver for the Chester Upland School District | : | |
| | : | |
| Appeal of: Pennsylvania Cyber Charter School | : : | No. 2095 C.D. 2015 |
| | : | |
| In Re: Appointment of a Receiver for the Chester Upland School District | : | |
| | : | |
| Appeal of: Pennsylvania Virtual Charter School | : : | No. 2096 C.D. 2015 |
| | : | |
| In Re: Appointment of a Receiver for the Chester Upland School District | : | |
| | : | |
| Appeal of: Agora Cyber Charter School | : | No. 2097 C.D. 2015 |
| | : | |
| In Re: Appointment of a Receiver for the Chester Upland School District | : | |
| | : | |
| Appeal of: Commonwealth Connections Academy Charter School | : : | No. 2098 C.D. 2015 |
| | : | |
| In Re: Appointment of a Receiver for the Chester Upland School District | : | |
| | : | |
| Appeal of: Pennsylvania Department of Education and the Secretary of Education Pedro A. Rivera | : : : | No. 2181 C.D. 2015 |
| | : | |
| In Re: Appointment of a Receiver for the Chester Upland School District | : | |
| | : | |
| Appeal of: Pennsylvania Department of Education and Secretary of Education Pedro A. Rivera | : : : | No. 2182 C.D. 2015 |
| | : | |
| In Re: Appointment of a Receiver for the Chester Upland School District | : | |
| | : | |
| Appeal of: Commonwealth Connections Academy Charter School | : : | No. 2183 C.D. 2015 |

| | | |
|---|---|---|
| In Re: Appointment of a Receiver for the Chester Upland School District | : | |
| | : | |
| Appeal of: Agora Cyber Charter School | : | No. 2184 C.D. 2015 |
| | : | |
| In Re: Appointment of a Receiver for the Chester Upland School District | : | |
| | : | |
| Appeal of: Pennsylvania Cyber Charter School | : | No. 2185 C.D. 2015 |
| | : | |
| In Re: Appointment of a Receiver for the Chester Upland School District | : | |
| | : | |
| Appeal of: Pennsylvania Virtual Charter School | : | No. 2186 C.D. 2015 |
| | : | |
| In Re: Appointment of a Receiver for the Chester Upland School District | : | |
| | : | |
| Appeal of: Achievement House Cyber Charter School | : | No. 2228 C.D. 2015 |
| | : | |
| In Re: Appointment of a Receiver for the Chester Upland School District | : | |
| | : | |
| Appeal of: PA Distance Learning Charter School and PA Leadership Charter School | : | No. 2229 C.D. 2015 |

## O R D E R

AND NOW, this 13th day of September, 2018, the Delaware County Common Pleas Court's October 9, 2015 and October 29, 2015 orders are reversed, and this matter is remanded for further proceedings consistent with the opinion.

Jurisdiction is relinquished.

_____
ANNE E. COVEY, Judge